## TWEEDIE TRADING CO. v. THOMSEN & CO.

(District Court, S. D. New York. November 4, 1909.)

SHIPPING (§§ 175, 184*)—DEMURRAGE—LACHES—EVIDENCE.

Demurrage and expenses at Savannah, Georgia. Claim for the recovery of a fine paid to the Brazilian government. *Held* that the libellant was entitled to recover for two days' demurrage and the expenses of moving the steamer Hathor across the river, for a violation of a bill of lading contract; also *held* that the testimony was too unsatisfactory to establish a claim for the recovery of the fine paid by a vessel to the Brazilian government.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 572–574; Dec. Dig. §§ 175, 184.*

Demurrage, see notes to Harrison v. Smith, 14 C. C. A. 657; Randall v. Sprague, 21 C. C. A. 337; Hagerman v. Norton, 46 C. C. A. 4.]

(Syllabus by the Judge.)

In Admiralty. Action by the Tweedie Trading Company against Thomsen & Co. to recover demurrage and certain expenses. Decree for libellant.

Ralph J. M. Bullowa, for libellant.
Wingate & Cullen, for respondents.

ADAMS, District Judge. This action was brought by the Tweedie Trading Company, chartered owner of the steamship Hathor, against Thomsen & Co., to recover certain demurrage and expenses, alleged to amount to $619.27, due by reason of the detention of the said steamer at Savannah, Georgia, in August, 1904, and for a further sum of $371.27, which the libellant was obliged to pay as a fine to the Brazilian Government in November, 1904, by reason of the steamer Nithsdale, of which it was also the chartered owner, not being furnished with proper invoices and entry papers.

The respondents, after sundry denials and admissions, allege as follows:

"Eleventh: For a first, separate and complete defense to the alleged cause, or to each of the alleged causes of action set forth in said libel.

That the defaults of respondents with respect to the contract or engagement of freight per S. S. Hathor as set forth in said libel, if any there were, were fully and completely waived by libellant orally at two or three conversations had between respondents and officers of libellant, held between the 7th day of September, 1904, and the 1st day of February, 1905; and by the delivery to respondents of a clean or unendorsed bill of lading dated August 31st, 1904, in pursuance of aforesaid contract or engagement of freight per S. S. Hathor; also that the defaults of respondents with respect to the delivery of invoices and entry papers for the S. S. Nithsdale as set forth in said libel, if any there were, were fully and completely waived by libellant orally at two or three conversations had between the respondents and officers of libellant, held between the 28th day of November, 1904, and the 1st day of April, 1905; and also that said defaults of respondents in respect to the delivery of invoices and entry papers for the S. S. Nithsdale as set forth in said libel, if any there were, were fully and completely waived by libellant in a letter sent by it to respondents dated December 30, 1904."

And the respondents further claim that the action is "stale and barred in admiralty by reason of the laches of libellant in the commencement" of the action.

The question of laches should be taken up first because if that defence is to prevail, further discussion is not necessary.

The first contract which was involved was dated June 13, 1904, but there was no breach till the beginning of the following September and the action was not actually ripe until somewhat later. In the Nithsdale part of the controversy, the bills of lading which formed the bases of the action were dated in November, 1904. The libel was filed January 22, 1908, and the original answer February 11, 1908. The action was therefore commenced about 3½ years after the transactions. In the absence of some special reason, loss of testimony, or something of that kind, I do not think that the mere lapse of time of this duration is sufficient to bar the action. Moreover, the secretary of the libellant testified that he had tried to collect the money many times.

There is no evidence sufficient to establish the respondents' claimed waiver.

With respect to the Hathor's part of the case, the contract was contained in two letters, as follows:

"New York, June 13th, 1904.

The Tweedie Trading Co., Present.

Dear Sirs: We confirm engagement of 150,000 feet of P. P. Lumber to be shipped by Steamer from Savannah to Santos at $12,—. p. 1000 ft. 1x12″ during the month of August, your option. It is understood that the lumber will go under &/or on deck, your option, but it would be preferable to us to have most of it, if not all, go under deck. B/Ldg. to contain the usual clause 'not accountable for splits, stains or broken pieces.' If you desire we can let you have the approximate specification of the 150,000 ft. which we intend to ship.

Please confirm & believe us. Dear Sirs.

Yours very truly,                          Thomsen & Co."

"New York, June 14, 1904.

Messrs. Thomsen & Co., 96 Wall St., New York.

Dear Sirs: Pitch Pine Savannah-Santos:— We duly received your favor of yesterday's date.

We confirm booking at $12. on or under deck at our option. August shipment, on 150,000 superficial feet of Pitch Pine, shipment subject to our usual Bill of Lading.

As explained to you, we will do everything possible to so arrange carrying the cargo, or the largest part of the cargo under deck, but even so, we think the chances are against it, and that practically all of the Lumber will be shipped on deck.

Yours very truly,                    The Tweedie Trading Co.,
                                     By M. Stanley Tweedie, President."

The bill of lading was dated August 31, 1904, but the date did not really represent the time of the transaction. The Hathor was delayed but the respondents did not avail themselves of the charter provision for a cancellation. She reached Savannah September 4th, when she proceeded to the wharf of the South Atlantic Steamship Company and loaded her cargo of rosin. A demand was then made for the lumber, which was not there, and the Hathor, after taking on the rosin, which occupied her until the 7th, was obliged to proceed to the Georgia Lumber Company's wharf, across the river, for the remainder of her

cargo. She was detained until the 9th, when she sailed. It is for these two days that demurrage is claimed, it being contended that if the lumber had been ready at the rosin place of shipment, she could have put it on at the same time she loaded the rosin.

The bill of lading, mentioned in the libellant's letter of June 14, 1904, supra, provided, inter alia:

"8. Also, Steamer to commence loading immediately upon arrival at the port of loading, and to load continuously, working all hatches at once, any custom of the port to the contrary notwithstanding. Any detention on the part of the shippers in supplying cargo as fast as Steamer can receive to be accounted for by the payment of demurrage by them at the rate of eight pence British Sterling per Steamer's net register ton, and Steamer to have a lien on cargo for same, unless contrary agreement outside of this Bill of Lading."

There seems to be no doubt that the lumber and rosin could have been loaded at the same time. The lumber was demanded at the time the rosin was being loaded but not furnished, hence the necessity of going across the river to the place where it was furnished. This moving caused the detention complained of and in view of the contract contained in the bill of lading that the vessel should "load continuously, working all the hatches at once," the libellant is entitled to recover for the demurrage and for the expenses caused by taking the vessel to the new place.

With respect to the second claim for the fine exacted in Brazil, the evidence is so unsatisfactory that nothing definite can be determined from it. The fine was probably imposed because some of the cargo had been stolen and the state thereby defrauded of its duties, but, in any event, there is nothing to legally substantiate the libellant's claim in this particular.

There will be a decree for the libellant for $619.27, with interest.